### LOWRY v. HENDERSON. (No. 6458.)

(Court of Civil Appeals of Texas. Austin. Oct. 4, 1922.)

**1. Homestead ⊂⟲214—Evidence insufficient to show that property was part of rural homestead.**

In trespass to try title, where plaintiff claimed land sold on execution as part of his rural homestead, the burden of proof rested on him to show that the property in question was not situated in the town of S., and therefore rural property, and evidence *held* to support judgment against him.

**2. Homestead ⊂⟲13—Cannot embrace both rural and urban lands.**

A resident homestead must consist of either urban or rural property, and cannot embrace both.

**3. Appeal and error ⊂⟲863—No jurisdiction to interfere with judgment in favor of party not before court.**

Where, in trespass to try title, the judgment appealed from awarded to one of the plaintiffs the east half of the land in question, and no one appealed from that portion of the judgment, and the plaintiff who recovered nothing was the only appellant, and his bond was not made payable to the other plaintiff, but only to defendant, on defendant's cross-assignment of error that the judgment appealed from should be reformed to award him an undivided interest in the tract, the plaintiff who recovered judgment against defendant for his portion of the land in controversy was not before the Court of Appeals, and therefore it had no jurisdiction to interfere.

Appeal from District Court, Coleman County; J. O. Woodward, Judge.

Trespass to try title by W. J. Lowry and another against Upton Henderson. From a judgment for defendant, the plaintiff named appeals. Affirmed.

Baker & Weatherred, of Coleman, for appellant.

Snodgrass & Dibrell, of Coleman, for appellee.

KEY, C. J. Appellant's brief contains the following statement of the nature and result of this suit:

"This suit was instituted by W. J. Lowry, appellant, and J. T. Lowry, as plaintiffs in the court below, against Upton Henderson, appellee, as defendant in the court below, in regular form of trespass to try title, for the recovery of two acres of land described by field notes in plaintiffs' petition; the plaintiffs claiming title to said land under a deed executed to them by Myrtle G. Wilkerson on October 2, 1916, filed for record on the ―――― day of ―――――, and the defendant, Upton Henderson, claiming title to said land under a sheriff's deed dated January 6, 1920, made by virtue of a sheriff's sale under an execution issued against W. J. Lowry. The evidence developed that there had been a verbal partition of said 2 acres of land between W. J. Lowry and Thomas Lowry; the said W. J. Lowry receiving as his portion under said partition the west one-half of said tract, and J. T. Lowry receiving as his portion the east one-half of said tract, and the improvements thereon.

"The appellant, W. J. Lowry, owned 131.9 acres of land in addition to the land in controversy, and situated about 6 miles from the land in controversy, upon which he had been residing and cultivating as a farmer for a number of years, and he used and cultivated the land in controversy every year in cotton and other farm products in connection with his home place, and claimed same as his homestead, not subject to the execution under which the appellee claims title. The court tried the case without a jury, rendering judgment for J. T. Lowry for the east one-half of said tract, and decreeing the appellant, W. J. Lowry, no relief, holding that the west one-half of said land was not part of his homestead, and was subject to the execution, and that the appellee had good title thereto under the sheriff's deed. The appellant duly excepted to the judgment of the court, and gave notice of appeal to the Court of Civil Appeals, filing his appeal bond within due time, and duly filed his assignments of error, and this cause is before this court upon errors so assigned."

The trial court filed the following findings of fact and conclusions of law:

"Findings of Fact.

"(1) I find that the plaintiffs, W. J. Lowry and J. T. Lowry, father and son, respectively, jointly purchased from Myrtle Wilkerson, a feme sole, the fee-simple owner thereof, the 2 acres of land described in plaintiffs' petition herein, and in deed of date October 2, 1916; that said 2 acres of land is in Coleman county, Texas; that immediately after purchasing said land a residence was built thereon by the plaintiffs, being built on the east one-half of said block of land; and that said residence has been occupied as a home by plaintiff J. T. Lowry, his wife, and children ever since and up to the present time.

"(2) I find that J. T. Lowry conducted a blacksmith shop in the town of Shields; that said town of Shields is unincorporated, there being no map or plat of said town of Shields; that same is a village or town consisting of a store or two, blacksmith shop, ginhouse and schoolhouse, and residences; that the two acres

of land involved in this controversy is just north of a public road and west of another public road, and said blacksmith shop used by the plaintiff J. T. Lowry is some 200 or 300 yards from this property. Said blacksmith shop is conducted by the plaintiff J. T. Lowry in said town of Shields.

"(3) I find that W. J. Lowry, father of J. T. Lowry, is the head of a family and owns a rural homestead, consisting of 156 acres of land, in Coleman county, Texas, about 5 or 6 miles from the town of Shields upon which he resided with his family at the time he and J. T. Lowry purchased the block of land described in their deed in controversy in this suit and upon which said 156 acres of land W. J. Lowry has ever since continued to reside and use as a homestead.

"(4) I find that said W. J. Lowry and the said J. T. Lowry agreed between themselves verbally, at the time said residence was built on the land in controversy, that J. T. Lowry should have the east one-half of said block, and that W. J. Lowry should have the west one-half of said block; that W. J. Lowry has never lived or resided upon the land in controversy in this suit at any time, nor in the town of Shields at any time; that the said W. J. Lowry did cultivate continuously the west one-half of said block in cotton or feedstuff since he and J. T. Lowry bought same.

"(5) I find that said W. J. Lowry and J. T. Lowry each paid one-half of the purchase price of said property; that said W. J. Lowry helped build the residence on the east one-half of said lot; that there was never any actual partition of said block between the plaintiffs other than said verbal agreement, and that defendant, Upton Henderson, was never informed or notified of said verbal agreement.

"(6) I further find that the defendant Upton Henderson recovered a judgment on the 22d day of November, 1910, in cause No. 1370, styled 'Upton Henderson v. R. C. Sanderson et al.,' in district court of Coleman county, Texas, for the sum of $269.91 and costs of suit, against W. J. Lowry and others; that the original execution was duly issued on said judgment within 12 months from date thereof and execution returned, leaving a balance unsatisfied in the sum of $216.23; that alias execution was thereafter on the 6th day of December, 1919, issued in manner and in form as required by law in Coleman county, Texas, and levied upon the property in controversy in this suit as the property of the execution defendant, W. J. Lowry, and after due and legal advertisement was sold in the manner as prescribed by law, and was purchased at auction by the defendant, Upton Henderson, for $140; that the officer executed and delivered to the said Upton Henderson proper conveyance thereof and made proper return to the court; that at the time of said levy and sale plaintiff W. J. Lowry was the owner of an undivided one-half interest in said block of land, the other undivided one-half interest being then and there owned by the said J. T. Lowry, according to the records of Coleman county, Texas, and in fact except as to said verbal agreement that said J. T. Lowry should have the east one-half and W. J. Lowry the west one-half.

## "Conclusions of Law.

"(1) I conclude that the verbal agreement between plaintiffs amounted to and effected a valid partition of the block, so that thereafter the plaintiff W. J. Lowry had no title or interest in the east one-half of said block, and the plaintiff J. T. Lowry had no interest in the west one-half of said block at the time of the execution sale to Upton Henderson; that at the time of said execution sale the west one-half of said block was the property of the plaintiff W. J. Lowry; that he did not have any homestead interest or right therein either in fact or law; said property being in the town of Shields, and, if not in the town of Shields, then said west one-half of said block was not used in connection with his rural homestead.

"(2) I conclude that west one-half was urban property and subject to his debts, and that all of his right—that is, all of the right and title of the said W. J. Lowry—was by virtue of said valid execution and sale acquired by the defendant, Upton Henderson, who is now the owner thereof, and therefore the plaintiff J. T. Lowry is entitled to recover of the defendant Upton Henderson the east one-half of said property, and that the plaintiff W. J. Lowry is not entitled to recover anything by his suit."

## Opinion.

The appeal is prosecuted by W. J. Lowry only; his contention being that the undisputed proof shows that the west one-half of the block of land, which he and T. J. Lowry purchased together, by an agreed partition between them became his property, and that at the time it was levied upon and sold under execution it was part of his rural homestead. Though incorporated in his conclusions of law, the court found as a fact that the property in controversy was in the town of Shields. That finding is supported by testimony, and if the testimony is not clear and satisfactory, still we think the judgment should be affirmed, because, after it was shown that the property had been sold under an execution against appellant, the burden rested upon him to show that it was a portion of his rural homestead. The proof was undisputed, as given by appellant himself, that at the time he and his son, T. J. Lowry, purchased the 2 acres of land, and at the time it was levied upon and sold under an execution issued against appellant, he was residing upon about 132 acres of land situated 5 or 6 miles away from the land in controversy, and the only testimony bearing upon the question as to whether or not the latter was rural or urban property was given by appellant and his son, T. J. Lowry. Upon that subject appellant testified as follows:

"At the time I purchased this acre of land out of the Manson survey in controversy in this suit it was not improved. There were no buildings or houses on it; in fact, there were no improvements on it at all at that time. It was just vacant property; it was not a town lot. I don't know whether it joined the town

of Shields or not. There is no blacksmith shop on this lot at this time. There is a residence on it, however. Tom Lowry and myself built that house. I couldn't say how long after we bought this property that we built the house, but I know we went right ahead and built the house. I will say that we began building the house in about 2 weeks. We got it built just as soon as we could I know. Tom Lowry was running a blacksmith shop in Shields, and he wanted to put up this house to live in. Tom and I together hauled the lumber for this house from Santa Anna. We hauled the lumber right away, and built the house as soon as we could, and Tom Lowry moved into it. I did not buy this lot so as to make a home for Tom Lowry. I just bought it to have the land. I bought it for Tom Lowry to have a home, so that he could have a home and go to work. I have never lived on this property. I didn't know whether I might live on it or not. ' I didn't know whether I would live on this property then or not. It wasn't necessary for me to move there, and I didn't know what I would do right then. As soon as we got the house completed, Tom moved in it, and has been living in it ever since. The deed recites a consideration of $100, $50 being in cash, and $50 being in a note. The $50 note has been paid, and I have a release to it. I owned a half interest in that property. That property is a farm, and I have cultivated it every year since we bought it; that is, this acre of land has been cultivated ever since we bought it. When he didn't cultivate the land, I did. Tom Lowry's blacksmith shop was not located on this piece of property, nor upon a piece of property adjoining it, but was in a different part of the town of Shields. Tom Lowry is still running a blacksmith shop in Shields."

## T. J. Lowry testified as follows:

"I said that I did not own any other land, except where the blacksmith shop is situated, and where I live. I lived in the town of Shields at the time we bought this land. I had a house rented there at that time. I moved onto this property as soon as we could get the house built. I also owned the land on which my blacksmith shop is situated in the town of Shields. I do not know whether this property is actually in the town site of Shields or not, because I don't know where the town site comes out, or anything about it. I suppose this property is about 150 yards from my blacksmith shop. I think this is a part of block 17 of the Manson survey. I think block 17 of the Manson survey has about 150 acres in it, and part of it is in a farm. The rest of that block is in pasture and farms, I think. My father or myself, neither one, rented the rest of that block nor used it. My father used the part of the land that we bought for a farm, but I did not use it as a farm. I used it as a residence only. There is supposed to be 2 acres in that piece of ground. I do not use as much as a half acre of it myself, and I do not use the rest of the block; but my father cultivated it. I never cultivated it myself. My father planted this lot in cotton whenever the rest of the farmers planted cotton. He used it the same as other farmers do. We bought this property in October, 1916. I heard my father testify about this property awhile ago. I did not hear my father testify that when he didn't farm this property that I did. I do not know whether this property is in the town site of Shields or not, because I do not know where the town site comes to. I do not know whether there are any town lots out beyond me or not. I don't think there are any streets out beyond this property. 'This property runs right up to the Brownwood and Paint Rock road; the rest of block 17 is north of my property adjoining it on the north. Our 2 acres is cut out of a big block in a straight block. There is not but one street by this property, and that is where the road crosses. There is some land between the 2 acres and this road, as our block does not run right up to the corner. The large block 17 of the L. C. Manson survey adjoins our 2 acres on the west, on the north, and on the east. Our 2 acres faces south on the Brady and Paint Rock road. The, Brady and Paint Rock road runs right through the town of Shields. The Brady and Paint Rock road and the Coleman and Brady road cross right in the town of Shields. There is none of the town of Shields out east of our 2 acres; that is, there is none of the business part of town out there. This property is on the left-hand side of the road going from Coleman to Brady. My blacksmith shop is on the left-hand side of the road going from Coleman to Brady. My blacksmith shop is situated on the north side of the road going from Brownwood to Paint Rock. The land upon which my blacksmith shop is situated is deeded direct to me. There are three stores in the town of Shields. It is just a little town where the road from Brownwood to Paint Rock and the road from Brady to Coleman cross. Those are the only streets in the town of Shields. It is just where the public roads cross. The blacksmith shop is not located on this 2 acres that belongs to myself and father."

[1, 2] It was shown that the town or village of Shields was not incorporated, and that there was no map or other instrument of record purporting to give its boundaries. We think the testimony given by appellant and his son justified the trial court in finding that the property in controversy is situated in the town of Shields, and therefore was no part of appellant's rural homestead, although he may have continuously cultivated it and used the proceeds for the support of himself and family. At any rate, as the burden of proof rested upon appellant to show that the property in question was not situated in the town of Shields, and therefore was rural property, we hold that he failed to discharge that burden, and therefore judgment was properly rendered against him. It is well-settled law in this state, and not controverted by appellant, that a residence homestead must consist of either urban or rural property, and that it cannot embrace both rural and urban lands.

[3] Under a so-called cross-assignment of error, appellee presents the contention that the judgment in his favor should be reformed, so as to award to him a recovery of an undivided one-half of the entire 2 acres of land. That contention is based upon the

proposition that the undisputed proof shows that at the time the property was sold under execution, and bought in by appellee, W. J. Lowry owned an undivided one-half in the entire 2 acres. That assignment must be overruled, regardless of what the proof may show, because the judgment appealed from awards to the other plaintiff in the suit, described by the petition and judgment as J. T. Lowry, but who testified that his name was Thomas J. Lowry, the east half of the 2 acres of land purchased by Thomas Lowry and his father, W. J. Lowry, from Myrtle Wilkerson, etc. No one has prosecuted an appeal from that portion of the judgment. In other words, W. J. Lowry, who recovered nothing, is the only appellant, and his appeal bond is not made payable to Thomas Lowry, but is payable only to Upton Henderson. This being the case, we hold that Thomas Lowry, who recovered judgment against Upton Henderson for the east one-half of the land in controversy, is not before this court, and therefore we have no jurisdiction to interfere with the judgment in his favor.

No reversible error has been shown, and the judgment is affirmed.

Affirmed.